**Nicole BEAULIEU, Petitioner,**

v.

**Kay MACK, Beltrami County Auditor, Respondent.**

No. A10–1389.

Supreme Court of Minnesota.

Oct. 7, 2010.

Nicole Beaulieu, Bemidji, MN, pro se.

Timothy R. Faver, Beltrami County Attorney, Bemidji, MN, for respondent.

## OPINION

PER CURIAM.

The issue presented in this case is whether respondent Kay Mack, the Beltrami County Auditor, properly rejected a petition nominating petitioner Nicole Beaulieu as a candidate of the Minnesota Warriors for Justice Party for State Representative, House District 4A. On June 1, 2010, Beaulieu filed a nominating petition bearing 556 signatures. Respondent Mack rejected 207 of the signatures on the petition, leaving Beaulieu 151 signatures short of the 500 signatures required for a valid nominating petition under Minn.Stat. § 204B.08, subd. 3 (2008).

On August 11, 2010, the court received from Beaulieu a nonconforming petition under Minn.Stat. § 204B.44 (2008). The court issued a scheduling order requiring Beaulieu to serve a petition that conformed with the statutory requirements of section 204B.44 on County Auditor Mack, on the other candidates for Minnesota State Representative for House District 4A, and on the Minnesota Secretary of State. Beaulieu complied, and on August 16 filed with our court a petition seeking an order requiring that Beaulieu's name be placed on the November 2010 general election ballot as a candidate of the Warriors for Justice Party for State Representative from House District 4A or, in the alternative, an order declaring the results of the

August 10, 2010, primary election invalid. The court received a response opposing the petition from respondent Mack. We issued an order on August 24, 2010, denying the petition, with this opinion to follow.

Candidates for partisan office who do not seek nomination by a major political party must be nominated by petition as provided in Minn.Stat. §§ 204B.07 and 204B.08 (2008). Minn.Stat. § 204B.03 (2008). Under Minn.Stat. § 204B.08, subds. 2 and 3, nomination for legislative office requires signatures equal to "ten percent of the total number of individuals voting in the . . . legislative district at the last preceding state or county general election, or 500, whichever is less," each of which must be of a person eligible to vote for the candidate who is being nominated.

Minnesota Statutes § 204B.07 provides the format for nominating petitions. Each person signing a nominating petition must "write on the petition the signer's residence address including street and number, if any, and mailing address if different from residence address." *Id.*, subd. 4. Upon receipt of a nominating petition by the appropriate election official, the petition is to be inspected "to verify that there are a sufficient number of signatures of individuals whose residence address as shown on the petition is in the district where the candidate is to be nominated." Minn.Stat. § 204B.10, subd. 3 (2008).

Of the 556 signatures on Beaulieu's nominating petition, the County Auditor determined that 207 signatures were defective for one reason or another: 43 of the addresses given were outside of the legislative district; 140 signatures listed as the residence address a post office box rather than a street and number; 19 listed no residence address or a defective residence address; and 5 were defective for other reasons. Eliminating these 207 signatures left Beaulieu with 349 valid nominating signatures, 151 signatures short of the 500 signatures required for a valid nominating petition.

As we understand her petition, Beaulieu essentially presents two arguments why Mack should be ordered to accept Beaulieu's nominating petition. First, Beaulieu contends that any nominating-petition requirement in general, and the requirement that a candidate present a petition bearing at least 500 signatures with valid residence addresses in particular are unconstitutionally burdensome and discriminate based on political beliefs and party preference. Second, Beaulieu argues that her petition was more closely scrutinized with regard to signers' residence addresses because she is a Native American, as evidenced by comparison to residence address information required for registration of voters in the previous election. In the alternative to her arguments that her nominating petition should have been accepted, Beaulieu asks us to set aside the August 10 primary election. We address each argument in turn.

I.

■ Beaulieu contends first that "petitions to run for public office and for party ballot status run[ ] against the very fabric of democracy." She asserts that the current statutory requirements for nominating petitions "amount[ ] to discrimination based upon both race and political beliefs and political party preference."[1]

---

1. Beaulieu urges us to either "establish requirements for signing a petition that are less [ ]cumbersome and restrictive" or order the Legislature to do so. In this respect, Beaulieu seeks remedies that we have no authority to grant. The requirements for nominating petitions are established by statute and, as a court, we cannot simply rewrite them as Beaulieu asks. *See City of St. Louis Park v. King,* 246 Minn. 422, 433, 75 N.W.2d 487,

To the extent that Beaulieu's argument is that it is unconstitutional to require any showing of support before a candidate's name can be placed on the ballot, the United States Supreme Court has rejected this contention. *See Jenness v. Fortson*, 403 U.S. 431, 435–38, 91 S.Ct. 1970, 29 L.Ed.2d 554 (1971). In *Jenness*, candidates of the Georgia Socialist Workers Party challenged Georgia's nominating-petition requirements. Under Georgia law, a nominee of a political organization that received less than 20% of the vote at the most recent gubernatorial or presidential election could qualify to have his name printed on the ballot by filing a nominating petition signed by at least 5% of the total number of electors eligible to vote in the last election for the office the candidate was seeking. *Id.* at 433–34, 91 S.Ct. 1970. The candidates argued that "to require a nonparty candidate[2] to secure the signatures of a certain number of voters before his name may be printed on the ballot is to abridge the freedoms of speech and association guaranteed to that candidate and his supporters by the First and Fourteenth Amendments." *Id.* at 434, 91 S.Ct. 1970 (footnote added). The Supreme Court found that Georgia's nominating-petition requirements "in no way freeze[ ] the status quo," *id.* at 439, 91 S.Ct. 1970, and concluded "[w]e can find in this system nothing that abridges the rights of free speech and association secured by the First and Fourteenth Amendments," *id.* at 440, 91 S.Ct. 1970. It is therefore not unconstitutional for the State to require a candidate for partisan office who is not nominated by a major political party to demonstrate some support for her candidacy before being placed on the ballot, as long as the requirement is not so onerous as to "freeze the political status quo." *Id.* at 438, 91 S.Ct. 1970. Beaulieu has made no showing that the nominating-petition requirements of Minnesota law freeze the political status quo by locking candidates of non-major parties out of the electoral process.

Beaulieu also appears to argue that the nominating-petition laws are unconstitutionally discriminatory because they require candidates of political parties that are not recognized as "major political parties" to obtain signatures on nominating petitions in order to appear on the ballot, while candidates of major political parties need only win a primary election.[3] This argument has also been rejected by the United States Supreme Court. In *Jenness*, the Court rejected the claim that it was a violation of equal protection for

---

495 (1956) (noting that courts cannot make, amend, or change the law). Nor can we simply order the Legislature to rewrite Minnesota's election laws, as Beaulieu also asks. *See* Minn. Const. art. III, § 1 (dividing the powers of government into "three distinct departments: legislative, executive and judicial" and providing that no department "shall exercise any of the powers properly belonging to either of the others" except as expressly provided elsewhere in the constitution). Rather, in light of Beaulieu's arguments, the issue for our determination is whether the statutory requirements for nominating petitions are unconstitutional and therefore cannot be applied to keep Beaulieu's name off the ballot.

**2.** Under Georgia law, a political organization whose candidate received at least 20% of the vote at the previous election was a "political party." *Id.* at 433, 75 N.W.2d 487. Any other political organization was a "political body." *Id.* The Court referred to candidates of political bodies and independent candidates, both of which were subject to the nominating-petition requirements, as "nonparty" candidates. *See id.* at 434, 75 N.W.2d 487.

**3.** *See* Minn.Stat. §§ 204D.10, subd. 1, 204D.12(a) (2008) (providing that nominee of a major political party is the candidate who wins the primary and the name of that nominee shall be placed on the general election ballot).

Georgia to require a political organization candidate to obtain the signatures of 5% of voters on a nominating petition, but to place on the ballot the names of candidates of political parties who have won nomination in primary elections. 403 U.S. at 434, 440, 91 S.Ct. 1970. The Court acknowledged "an important state interest in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot—the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Id.* at 442, 91 S.Ct. 1970; *see also Am. Party of Tex. v. White*, 415 U.S. 767, 782–83, 94 S.Ct. 1296, 39 L.Ed.2d 744 (1974) ("So long as the larger parties must demonstrate major support among the electorate at the last election, whereas the smaller parties need not, the latter, without being invidiously treated, may be required to establish their position in some other manner.").

To the extent that Beaulieu's argument is directed at the particular nominating-petition requirements at issue here, they are not unconstitutionally burdensome. Under Minn.Stat. § 204B.08, subd. 3(c), the number of signatures required for a nominating petition for legislative office is "ten percent of the total number of individuals voting in the county or legislative district at the last preceding state or county general election, or 500, whichever is less." That is, in order to appear on the general election ballot, a candidate for legislative office running as an independent or representing a non-major political party never needs to secure more than 500 valid signatures on a nominating petition. This requirement does not make the statute unconstitutional. Indeed, rejecting a challenge to Texas nominating-petition requirements for independent candidates, the Supreme Court held that "[d]emanding

signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face, and *with a 500–signature limit in any event, the argument that the statute is unduly burdensome approaches the frivolous." Am. Party of Tex.*, 415 U.S. at 789, 94 S.Ct. 1296 (emphasis added) (citation omitted). Beaulieu has provided no reason why a different conclusion is warranted for Minnesota's nominating-petition requirement that requires at most 500 signatures. Nor has Beaulieu presented any argument, much less authority, demonstrating that it is unconstitutional for the State to require that a candidate demonstrate support for her candidacy among those who would be eligible to vote for her, as opposed to the public at large.

Accordingly, Beaulieu's contention that the requirement to file a nominating petition with at least 500 valid signatures is unconstitutionally burdensome is without merit. The decisions of the United States Supreme Court in *Jenness* and *American Party of Texas* establish that such a nominating-petition requirement violates neither the freedoms of speech and association nor the right to equal protection.

Beaulieu also argues that her petition should have been accepted under the approach taken by the Arizona Supreme Court in *Jenkins v. Hale*, 218 Ariz. 561, 190 P.3d 175 (2008). In *Jenkins*, the Arizona Supreme Court held that signatures on a nominating petition for which only a post office box number was provided were not automatically invalid "if an elections official can verify that the signer is a qualified elector." *Id.* at 179. The decision in *Jenkins*, however, was based on the provisions of the pertinent Arizona statutes, not constitutional principles, and Arizona's election laws differ significantly from Minnesota's.

In Arizona, the person circulating a nominating petition is required to " 'verify that ... in his belief each signer was a qualified elector who resides at the address given as the signer's residence on the date indicated.' " *Id.* at 176 (quoting Ariz.Rev.Stat. § 16–321(D)). Arizona law then provides that a qualified elector may challenge the petition. *Id.* In contrast, there is no requirement in Minnesota law that a person circulating a nominating petition personally vouch for the status of petition signers and no basis on which election officials could presume that signatures on the petition are valid. Rather, Minn.Stat. § 204B.10, subd. 3, requires election officials, not challengers, to "inspect the petitions ... to verify that there are a sufficient number of signatures of individuals whose residence address as shown on the petition is in the district where the candidate is to be nominated." Under Minnesota law, therefore, the petition itself must include enough information for election officials to determine that the candidate has presented sufficient signatures of individuals who reside within the district and would be eligible to vote for the candidate if nominated.

## II.

■ Beaulieu further claims that her nominating petition was "more closely scrutinized" because she is a Native American candidate. She contends this closer scrutiny was unlawful racial discrimination, which we take to be an argument that she was deprived of the equal protection of the laws under the Fourteenth Amendment to the United States Constitution and Article I, § 2 of the Minnesota Constitution. Although Beaulieu states that she believes her nominating petition would

have been treated differently if she were a white candidate, she offers no evidence of different scrutiny afforded to nominating petitions of any others. Rather, Beaulieu claims the evidence of discriminatory treatment is in voter registration lists of other Native Americans.

In particular, Beaulieu asserts that in the previous election, respondent Mack allowed voters to register to vote by providing only their names and city or township without a street address or post office box number. Beaulieu attaches to her petition voter registration lists showing voters in Red Lake and Redby, Minnesota, for whom the only street address listed is "1 Red Lake Precinct" or "1 Redby Precinct." For the vast majority of these voters, a post office box is also given, as the mailing address. Nevertheless, we understand Beaulieu to be claiming that because County Auditor Mack accepted voter registration applications for Native Americans that listed only a city or township, she was required also to accept signatures on Beaulieu's nominating petition based on a city or township provided, and the Auditor's failure to do so violated Beaulieu's right to equal protection of the laws.

In her response to the petition, County Auditor Mack explains that residences on the Red Lake Reservation have no street addresses, that the Red Lake Reservation has not implemented enhanced 911 addressing,[4] and that the entire reservation lies within a single election district. According to the County Auditor, Beltrami County has therefore accepted voter registration applications that list a Red Lake post office box, "[b]ecause residences on [the] Red Lake [reservation] do not have addresses, but all persons residing on the

---

**4.** Enhanced 911, also known as E911, allows emergency responders to associate a specific

telephone number with a physical address.

Red Lake Reservation are within a single election district."[5]

Many of the signatures on Beaulieu's nominating petition that were rejected by the County Auditor for lack of a residence address are from Cass County, in which, according to the County Auditor, enhanced 911 addressing has been fully implemented, including on the Leech Lake Reservation. Unlike the Red Lake Reservation, the Leech Lake Reservation is not located within a single election district. County Auditor Mack's response suggests that persons living in Cass County on the Leech Lake Reservation could have indicated their eligibility to vote for Beaulieu, and thereby their eligibility to sign her nominating petition, by listing as a "residence address" the enhanced 911 number assigned to their residence. While nothing in Minnesota's current election laws specifically authorizes the use of an enhanced 911 number as a residence address, we need not resolve that issue here. Even if we were to hold that the County Auditor should have accepted those signatures on Beaulieu's nominating petition for which nothing more than a city or township in House District 4A were provided, the petition would still not have the required 500 signatures.

■ Moreover, in order to establish that she has been denied equal protection of the laws, Beaulieu must show that similarly situated persons have been treated differently. *See Hale v. Viking Trucking Co.*, 654 N.W.2d 119, 125 (Minn.2002). The guarantee of equal protection of the laws does not require the State to treat persons who are differently situated as though they are the same. *State v. Behl*, 564 N.W.2d 560, 568 (Minn.1997). Although registering to vote and signing a nominating petition both require some proof of address, the voter registration statutes and the statute governing nominating petitions differ in their description of the address requirement. The statute governing nominating petitions requires signers to provide "the signer's residence address including street and number, if any, and mailing address if different from residence address." Minn.Stat. § 204B.07, subd. 4. No statute governing voter registration uses the same language to describe the information that a prospective voter is required to provide. The voter registration lists filed by Beaulieu in support of her petition under Minn.Stat. § 204B.44 therefore do not establish that the County Auditor has differentially enforced similar address requirements. *Cf. Am. Party of Tex.*, 415 U.S. at 781–82, 94 S.Ct. 1296 ("Appellants' burden is not satisfied by mere assertions that small parties must proceed by convention when major parties are permitted to choose their candidates by primary election. The procedures are different, but the Equal Protection Clause does not necessarily forbid the one in preference to the other." (footnote omitted)).

■ Beaulieu contends that the County Auditor's rejection of her nominating petition amounted to selective enforcement of Minnesota election laws. Even ignoring the fact that different statutes and procedures govern voter registration and nominating petitions, differential enforcement of a facially neutral law, without more, does not violate equal protection. Beaulieu was also required to prove that any differential enforcement by County Auditor Mack of the residence address requirement was the product of intentional discrimination. *See Sheehan v. Franken (In*

---

5. It is not clear from either the County Auditor's response or the voter registration lists what additional information, if any, these voters may have provided regarding their location of residence.

*re Contest of Gen. Election)*, 767 N.W.2d 453, 464 (Minn.2009) (requiring Coleman to have proven intentional discrimination in order to prevail on a claim that disparate application by local election jurisdictions of the requirements for absentee voting violated equal protection). Beaulieu has not made such a showing.

### III.

As an alternative form of relief, Beaulieu asks us to invalidate the results of the August 10 primary election because, Beaulieu alleges, the County Auditor and the Secretary of State were aware that some individuals who voted in the primary had registered to vote by providing only the city or township and county of their residence, rather than a street address. We decline to invalidate the results of the primary election.

Minnesota Statutes § 201.195 (2008) allows a registered voter to challenge, before election day, the eligibility or residence of any other voter registered in the county. Minnesota Statutes §§ 204C.12 and 204C.13 (2008) also allow for challenges to the eligibility of a voter, including the voter's residence, at the polls. There is no indication that Beaulieu challenged the residency of any voter, either before the primary election or at the polls. We have concluded that Minn.Stat. § 204C.13, subd. 6, forecloses any challenge to the legality of an absentee ballot, based on such things as the residence of the absentee voter, once the ballot has been deposited in the ballot box. *Sheehan*, 767 N.W.2d at 467. We similarly conclude here that Minn.Stat. § 204C.13 bars challenges in the primary election to voter eligibility based on residence address once the ballot has been deposited into the ballot box.

In sum, we hold that in rejecting Beaulieu's nominating petition for lack of sufficient signatures, County Auditor Mack did not violate either Minnesota law or Beaulieu's constitutional rights.

Petition denied.